# EXHIBIT 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5        TVIIM, LLC,            )

6               Plaintiff      )

7        vs.                    )

8        MCAFEE, INC.,          ) Case No. 3:13-CV-04545-VC

9               Defendant       )

10

11

12            ORAL VIDEOTAPE DEPOSITION of LANCE E.

13       GUNDERSON, taken before Ryan K. Black, CLR,

14       RPR, Notary Public, in and for the District

15       of Columbia, at the offices of Wilmer Cutler

16       Pickering Hale and Dorr, LLP, 1875 Pennsylvania,

17       NW, Washington, D.C., on Tuesday, February 24,

18       2015, commencing at 7:57 a.m.

19

20       Pages 1 - 269

21

22

23

24

25

                                              Page 1

1       is -- is -- that's -- that's the best benchmark

2       we have, was the actual transaction involving

3       the technology.  So that's really the -- the

4       basis for that opinion.

5           Q.   So then why raise -- why have the --

6       the range up to a hundred thousand dollars, if

7       you're saying here that the -- the -- you can't

8       -- you can't conceive of how it would be higher

9       than 10?

10          A.   To -- to give a little bit of wiggle

11      room, I guess, in terms of what a license would

12      be.

13              There were other some other data

14      points, as well, that -- that indicated,

15      potentially, transactions that were higher.  But

16      they involved other -- other stuff, I would say,

17      and included the patent that is actually issued

18      in this case.

19          Q.   What data points are you talking

20      about?

21          A.   Well, there was a $125,000

22      transaction, I think.  Let me look at my report

23      here.

24              Early on in my report, I've got a

25      little chart here that -- yeah, it was the

Page 52

1      Innerwall transaction for $125,000, so there was

2      that transaction that also involved the -- the

3      patent.

4           Q.   Did it involve the patent?  The patent

5      hadn't issued -- hadn't issued at that point,

6      had it?

7           A.   Well, the application, I suppose.

8           Q.   Well, is an application worth the same

9      amount as a patent?

10          A.   It has value.  I would say it is worth

11     more once it -- the patent actually issues.

12          Q.   Okay.  And what -- that -- that

13     transaction was in what year?

14          A.   I want to say 2007.  I could be -- I

15     could be off here.  I don't know.

16               I have it in my report here.

17               (Deposition Exhibit No. 319, a

18     document titled, Purchase Software Agreement,

19     dated September 1st, 2002, signed by Mr. Ricotta

20     and Mr. Doll, was marked.)

21     BY MR. SHAEFFER:

22          Q.   I'll mark as Exhibit 319, just to

23     make life easier for you, a document called

24     Software Purchase Agreement, dated September

25     1st, 2002, --

Page 53

1          the transaction --

2              A.   Yeah.  Cards are dealt face-up.  They

3      would, too.

4              Q.   They would know, as well?

5              A.   Right.

6              Q.   And it's your opinion that that

7      valuation would be of economic comparability,

8      the idea of McAfee selling millions of units

9      of the patented technology is economically

10     compatible with a joint venture to attempt to

11     otherwise monetize these products?

12             A.   Absolutely, because at those times,

13     they had the technology and they certainly knew

14     who the players in the market were.  And if

15     they -- they thought that people were using the

16     technology -- I mean, it was the -- the value of

17     the technology at the time, and they were aware

18     of the players in the market.  McAfee was there

19     at the time.  McAfee was selling products at the

20     time that the patent issued, so they would know,

21     or should know.

22             Q.   And EIM contemplated getting 50

23     percent of whatever was able to be obtained

24     from McAfee at the time they entered the joint

25     venture transaction, did they not?

1          A.    Absolutely.

2          Q.    And you consider this joint venture

3     EIM buying a lottery ticket?

4          A.    In many ways, yes.  They're trying to

5     strike -- they're trying to strike it rich.  And

6     they're trying to throw these patents in there,

7     and they're trying to sue people to try to get,

8     you know, this huge payout of -- from -- from, I

9     guess, McAfee in this case, or anybody else they

10    tried to -- decided to sue.

11         Q.    And -- and that lottery ticket is

12    economically comparable to a large company

13    wanting to put your technology into millions of

14    units of product?

15         A.    I don't know -- what I would say

16    is, that in terms of valuing the technology

17    and determining what a lump sum would be, it's

18    certainly comparable -- it's certainly relevant,

19    rather, to look at what was paid for the

20    technology.  And in this instance, the entire

21    patent was -- was contributed for the fair

22    market value of $10,000.

23         Q.    And we're just getting back to

24    the simple point.  You understand under the

25    Georgia-Pacific factors, when you're looking at

Page 84

1      licenses, you're supposed to be looking at

2      economically comparable licenses?

3            A.   I do, and I think this is -- this is

4      comparable and relevant.

5            Q.   It's comparable?

6            A.   Yes.

7            Q.   Okay.

8            A.   Yes.  It's -- and relevant to the

9      question of what the value of the technology

10     was.

11           Q.   Do you -- I understand, in terms of

12     what the value of the technology was, but in

13     your -- other than that it is information

14     relevant to the value of the technology, are

15     the two transactions economically comparable?

16           A.   I believe that -- that the first

17     transaction, the TVIIM transaction, is certainly

18     relevant as to what the transaction would be

19     with McAfee in the hypothetical negotiation.

20           Q.   And I appreciate that, but I'm just

21     using from the Georgia-Pacific factors when

22     you're looking at other transactions that

23     transactions need to be economically comparable.

24     And I'm just trying to ensure that it is your

25     testimony, and your opinion in this case, that

Page 85

1        the joint venture agreement, that you've

2        referred to as a lottery ticket, is economically

3        comparable to McAfee incorporating this

4        technology into its products?

5             A.   Given the de minimis value of the

6        technology itself, yes, I believe they're

7        economically comparable.

8             Q.   Okay.  And it's solely based, then, on

9        the de minimis value of the technology?

10            A.   It's based on the actual transactions

11       that -- that -- that have occurred, and they are

12       consistent with what I believe a hypothetical

13       negotiation would come up with, given the de

14       minimis value that McAfee perceived with the

15       technology to add to its product.

16            Q.   And I guess we're just having a -- an

17       issue in nomenclature.

18                 I understand that you say that you

19       understand and look at this joint venture

20       agreement as providing a fair market value of

21       the technology, correct?

22            A.   Yes.

23            Q.   Okay.  And independent -- if you take

24       the dollar number out of that transaction, is a

25       joint venture agreement to pursue litigation on

Page 86

1    a patent an economically comparable transaction

2    to a transaction where a large corporation

3    intends to put the technology into its patent,

4    into its products, millions of units of its

5    products?  Are those economic -- independent of

6    the dollar figures in them, are those

7    economically comparable transactions?

8        A.   And what I would say is, at the

9    hypothetical negotiation, McAfee and -- and

10   EIM have the cards dealt face up, and that

11   transaction is very consistent with the de

12   minimis value that McAfee valued the technology

13   that was going to go into those products.

14       Q.   And we're moving from the dollar value

15   in the joint venture.  I'm just asking you a

16   more specific question.  Is a joint venture to

17   pursue patent litigation involving technology an

18   economically comparable transaction to a large

19   corporation wanting to put the technology in

20   millions of units of its products?

21       A.   Yes.  I believe they are economically

22   comparable, because, at the time of the joint

23   venture, they knew who they were going to

24   pursue, they would have knowledge about what the

25   value -- you know, what would lead to the value

Page 87

1      that they had.  So, yes, I believe that they

2      are.

3          Q.   So at -- at -- at the time they

4      entered the transaction, they knew they were

5      going to sue McAfee?

6          A.   They certainly had some idea that

7      there were targets out there that they were

8      going to go after.  Otherwise, they wouldn't

9      have done the transaction, in my opinion.

10         Q.   And what do you base that on?

11         A.   Just logic, if nothing else.

12         Q.   But you haven't -- you haven't seen

13     anything in the records that you reviewed, or

14     the facts you reviewed, that indicates that, at

15     the time the joint venture was entered into, the

16     parties had knowledge of the extent of use by

17     third parties of the patented technology?

18         A.   Well, it -- it doesn't take a rocket

19     scientist to go out to the publicly available

20     information and look at all the different

21     companies out there.  And I certainly have a

22     belief that they knew there were millions of

23     copies of -- of various types of antivirus

24     software out there, and they had some knowledge

25     as to who they might be able to go after.  I

Page 88

```
 1        license for that technology to a manufacturer?
 2              A.   You keep using the word compatible.
 3        Do you mean comparable?
 4              Q.   Do the two words mean the same thing
 5        to you?
 6              A.   I think they're slightly different,
 7        but --
 8              Q.   Which would you prefer I use?
 9              A.   Comparable.
10              Q.   Comparable?
11              A.   Well, I mean, you can use whatever
12        word you want.
13              Q.   If you prefer comparable, I'll use
14        comparable.
15                   Would a -- is a joint venture
16        involving technology necessarily comparable to
17        a license of that technology to a manufacturer?
18              A.   I guess it depends on the facts and
19        circumstances.
20              Q.   Okay.  So it may or may not be
21        comparable?
22              A.   It may or may not be.
23              Q.   Okay.  And my question now is,
24        looking at your report, can you show me the
25        facts that you rely upon to show that any of
```

Page 114

1      the transactions involving the '168 patent

2      are comparable to a license of that patent --

3      economically comparable?  I know they involve

4      the same technology.  Economically comparable

5      to the hypothetical license to McAfee?

6            A.    Okay.  Let me take a look here.

7                  So I'm on Page 19.  I'm starting to

8      read through this -- these various transactions,

9      the DMW transaction and the Innerwall

10     transaction, I guess.

11                 So each one of these things -- each

12     one of these transactions actually involve more

13     -- you know, economically involve more than just

14     the patent at issue.  So in -- in that sense,

15     they provide a ceiling or a cap, I would say.

16                 So, you know, for example, on Page 23,

17     it's talking about the EIM transaction 2007.

18     And it talks about all the different rights they

19     got with this transaction.  So they got -- you

20     know, I have it listed out here on Page 23, all

21     versions of Secure Enclave, so they've got some

22     software; all versions of Stilleto, and that's

23     software.  They've got the '168 patent, the

24     patent we're talking about here; four U.S Patent

25     applications; the Innerwall trademark; and

Page 115

```
 1        hardware, which primarily consists of computer

 2        equipment.  And so those are the assets.

 3                   So from an economic comparability

 4        standpoint, I would say that, if anything, they

 5        got more than just the '168 patent, clearly.

 6        And the value, if anything, of the '168 patent,

 7        would be something less.  So in terms of

 8        economic comparability, I would say that this

 9        puts a ceiling on what the value of the '168

10        patent is.

11                   So -- and the other transactions are

12        similar, in that each of the transactions, with

13        the exception of the last one, the TVIIM

14        transaction, involves software and involve a

15        lot of other stuff.

16                   The TVIIM transaction was a little

17        bit more narrow.  It involved three patents and

18        three patent applications.

19             Q.   So other than the things people got in

20        the transactions involving the '168 patent, is

21        there anything -- any other factual support in

22        your report for the economic comparability or

23        comparability of the -- those transactions with

24        the hypothetical negotiation with McAfee?

25             A.   Well, again, these -- these parties,
```

Page 116

 1    opposed to answering yes or no.

 2         A.   I -- I think that's consistent with my

 3    understanding.

 4         Q.   Okay.  And to the extent that the

 5    hypothetical negotiation occurred during the

 6    period of time that -- that EIM had its contract

 7    with the Air Force, that would have a material

 8    impact on your opinion, would it not?

 9         A.   I think my opinion -- my opinion would

10    be consistent whether or not the hypothetical

11    negotiation date was before or after that

12    cancellation of the contract.  Because,

13    ultimately, we have these baselines of value,

14    in terms of what the -- the value of the -- you

15    know, what the maximum value is of the -- of the

16    technology.

17              We have -- we have, in various points

18    in time, and even if the -- the hypo date was a

19    year before January of 2013, when the $10,000

20    transaction occurred, or three months before, I

21    think it would still be consistent, because,

22    from a Book of Wisdom standpoint, I can still

23    look forward and look at what the value was at

24    that time.

25         Q.   But you've agreed with me a moment ago

Page 131

1     would have done prior to what -- when they had

2     a problem?  I guess I don't understand your

3     question, but I think it's speculative to say

4     what they -- what they would have done.

5          Q.   Well, so -- so you -- if it -- if

6     it is determined, then, that the hypothetical

7     negotiation took place at a time prior to

8     sequestration, you have no opinion as to

9     what the license would be, do you?

10               MR. MUELLER:  Objection.

11               THE WITNESS:  No.  That's not true.

12    I mean, my -- I think my opinion would be

13    consistent with what I've already said.

14               I think I would have the same opinion.

15    BY MR. SHAEFFER:

16          Q.   Okay.  And that's -- that's -- there

17    we go.  Now I want to know what facts you have

18    that EIM would have licensed for the same --

19    licensed to McAfee for the same value it

20    attributed to its technology at the time of

21    the joint venture if the nego -- hypothetical

22    negotiation occurred prior to EIM being in

23    financial distress?

24               If you have the same opinion, you have

25    to have a fact as to why the financial distress

Page 144