# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| TVIIM, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>MCAFEE, INC.,<br><br>    Defendant. | Case No. 3:13-cv-04545-VC |
| MCAFEE, INC.,<br><br>    Counterclaimant,<br><br>v.<br><br>TVIIM, LLC,<br><br>    Counterclaim Defendant. | |

### EXPERT REPORT OF LANCE E. GUNDERSON

January 16, 2015
**Date**

_____
**Lance E. Gunderson**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

that offered "fully functional" or "fully registered" copies of HostCHECK to evaluate free of charge.[44] As a final example, an undated DMW marketing mailer for HostCHECK promoted "You can't afford to wait-call now! . . . ORDER HOSTCHECK TODAY!" and offered "A Single Host" price of $395.[45] Kevin Reynolds testified that he did not think HostCHECK was ever sold or licensed as a product to the public, however documents I reviewed (such as the documents cited above) and testimony of Frank Ricotta appear to contradict Kevin Reynolds' testimony and indicate that HostCHECK was on sale.[46]

Like HostGUARD before it, HostCHECK was not successful. Frank Ricotta and Kevin Reynolds both testified that HostCHECK was not commercially successful as a product.[47] Frank Ricotta further testified that there were only a few sales of HostCHECK (at a price of less than $100) and the revenue "was pretty nominal in terms of revenue contribution from [license] fees."[48] Frank Ricotta also testified that DMW offered HostCHECK for a license fee but it "never really took off" and that DMW focused on other products and did not provide the energy required to make HostCHECK successful in the marketplace.[49] Eric Knight testified that the HostCHECK released in 1998 with bugs "was a tremendous embarrassment" and that the release "was pretty much the end of HostCHECK."[50]

In the end, DMW ceased selling HostCHECK and sold its business. Frank Ricotta testified that DMW was unable to obtain additional investments and DMW ended up selling the

---

[44] 84922DOC003271; 84922DOC003439; 84922DOC003443; 84922DOC003449.
[45] 84926DOC000040-000041.
[46] Deposition of Kevin Joseph Reynolds, September 9, 2014, page 103; Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 50-51.
[47] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 48-51; Deposition of Kevin Joseph Reynolds, September 9, 2014, pages 106-107.
[48] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 50-51.
[49] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 57-58, 60.
[50] Deposition of Eric Knight, August 5, 2014, page 221.

I reviewed pricing documents that indicate Innerwall offered Secure Enclave to the market. For example, a document titled "Innerwall Pricing Model – 2005" included "Enclave License Fees" of $30,000 for up to 25 devices, $50,000 for up to 250 devices, $100,000 for up to 500 devices, and $250,000 for up to 1,000 devices or more.[66] A similar document titled "Innerwall Pricing Model – 2006" included "Enclave License Fees" of $30,000 for up to 25 devices, $50,000 for up to 250 devices, $150,000 for up to 500 devices, and $250,000 for up to 1,000 to 2,000 devices.[67] As another example, a 2007 fax sent from Frank Ricotta included a "Price Schedule" for "Secure Enclave Products" that included suggested prices of $65,000 for 0 to 250 users, $195,000 for 251 to 500 users, $325,000 for 501 to 1,000 users, and $650,000 for 1,001 users and above.[68] These various prices translated into per-device or per-user prices of approximately $125 to $1,200.

Though it was offered for sale, Frank Ricotta testified that Innerwall only sold Secure Enclave licenses to three to four beta customers.[69] For example, in April 2006, Innerwall executed a "Software License Agreement" with Topia Technology, Inc. ("Topia") in which Topia acquired "a perpetual non-exclusive license to use Innerwall's ENCLAVE™ software product."[70] In addition, Innerwall was obligated to provide Topia with certain "Support" and "Training" as set forth in a "Maintenance and Support Services" agreement that was part of the software agreement.[71] In return, Topia was to pay Innerwall unspecified license fees.[72]

---

[66] 84922DOC001213-001220 at 001213-001214.
[67] 84922DOC001155-001161 at 001161.
[68] EIM000571-000583 at 000571, 000573.
[69] Deposition of Frank J. Ricotta, Jr., December 20, 2014, page 75.
[70] EIM000646-000663 at 000646.
[71] EIM000646-000663 at 000653, 000662-000663
[72] EIM000646-000663 at 000651 (an attached schedule appears to be missing from the agreement).

As another example, in May 2006, Innerwall executed a "Production License Agreement" with EIM.[73] This agreement provided for the purchase of Innerwall's Secure Enclave software by EIM and granted a license to EIM to use such software without infringing Innerwall's "Applicable Patent Rights," including the '168 patent.[74] The agreement further required that Innerwall deliver and install its software, and provide maintenance and monitoring services to EIM.[75] The agreement stated that the total license fee to be paid by EIM was $80,000.[76] Certain hardware, training, installation, integration and tuning, and travel were all included in the license fee.[77]

Frank Ricotta testified that these three to four beta customers paid between $30,000 and $100,000 each for a software license to Secure Enclave (which included the software itself, certain hardware, and associated services such as installation and support), resulting in Innerwall total revenue of approximately $100,000 to $200,000 (or potentially up to $500,000).[78] These revenues are less than an estimate of the "Cost-to-Recreate" Innerwall's software technology, which was estimated to be approximately $1.4 million in a report prepared by the McLean Group in connection with EIM's acquisition of Innerwall.[79]

As Innerwall marketed and attempted to sell Secure Enclave, Innerwall experienced operating losses. For example, Innerwall's audited income statements reported operating losses

---

[73] EIM000976-000992.
[74] EIM000976-000992 at 000976-000977.
[75] EIM000976-EIM000992 at 000978, 000988-000991.
[76] EIM000976-000992 at 000977, 000986.
[77] EIM000976-000992 at 000977, 000986.
[78] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 74-76, 81-83; EIM000646-000663; EIM000976-000992.
[79] Deposition of Frank J. Ricotta, Jr., December 20, 2014, Exhibit 10 (page 29).

of $1.1 million in 2004 and $3.7 million in 2005.[80] An Innerwall unaudited statement of operations through the first seven months of 2006 reported operating losses of $2.3 million.[81] As another example, in 2006 and 2007, Innerwall cash management statements reported low cash balances and projected negative cash balances.[82]

In the end, Secure Enclave failed. Frank Ricotta testified that the development of the products was never finished and the products were never sold on a broader basis as Innerwall never got to a broad launch of the product suite.[83] Frank Ricotta further testified that by 2007, Innerwall was about to go out of business and needed financing, and that product development was more than likely going to stop, or at least be suspended.[84] Given those circumstances, Innerwall agreed to be acquired by Enterprise Information Management ("EIM") in 2007.[85]

  **4) EIM**

Innerwall sold its business to EIM in return for a 20% equity stake in EIM.[86] Frank Ricotta, who joined EIM after the acquisition and became EIM's Chief Technology Officer, testified that EIM did not attempt to continue with Secure Enclave or security technology other than to continue to support the patent applications by maintaining the patent prosecution.[87] Frank Ricotta further testified that no one at EIM, including former Innerwall employees, worked on security technology at EIM.[88] Instead, EIM focused on other, non-security work,

---

[80] 84922DOC007933-008078 at 008025, 008030.
[81] 84922DOC007933-008078 at 008021.
[82] 84922DOC013999-014014 at 013999-014001; 84922DOC014083-014098 at 014083; Deposition of James Vincent Bitonti, December 3, 2014, pages 107, 114.
[83] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 74-76, 81-83.
[84] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 85-86, 123.
[85] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 85-86, 123; Bitonti000852-001049 at 000859.
[86] Bitonti000852-001049 at 000860.
[87] Deposition of Frank J. Ricotta, Jr., December 20, 2014, pages 92-93, 122-124.
[88] Deposition of Frank J. Ricotta, Jr., December 20, 2014, page 94.

### 5) TVIIM

In 2013, EIM contributed its patent portfolio, including the '168 patent, in return for a 50% equity interest in TVIIM.[96] The joint venture formation documents valued EIM's patent portfolio at $10,000.[97] Paul Jonjak, TVIIM's President, testified that TVIIM does not offer any products for sale, is not pursuing developing products to sell, and the only service it currently provides is realizing value from its patent portfolio.[98] Currently, TVIIM's business consists solely of this litigation and TVIIM has not tried to license the '168 patent to others.[99] Paul Jonjak further testified that TVIIM has not earned any revenue since its inception.[100] James Bitonti testified that when EIM joined forces with ThinkVillage, the investment was for purposes of litigation and not product development.[101]

### 6) Conclusion

Based on my review of documents produced in this case and deposition testimony, as set forth above, it is my opinion that the practicing products were not commercially successful. To the contrary, in every instance, the practicing products failed to achieve commercial success in the market and were ultimately taken off the market.

## B) Ownership Transfers of the '168 Patent

As another aspect of my analysis of the commercial success of the '168 patent, I considered the ownership transfers of the '168 patent or the underlying intellectual property and the market value for the technology that these ownership transfers indicate.

---

[96] TVIIM009619-009728 at 009620, 009628, 009683.
[97] TVIIM009619-009728 at 009620, 009717.
[98] Deposition of Paul Leon Jonjak, September 12, 2014, pages 43, 61-62.
[99] Deposition of Paul Jonjak, January 6, 2015, page 32 (Uncertified Draft Transcript).
[100] Deposition of Paul Leon Jonjak, September 12, 2014, page 83.
[101] Deposition of James Vincent Bitonti, December 3, 2014, page 102.