UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TVIIM, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>MCAFEE, INC.,<br><br>        Defendant. | Case No. 13-cv-04545-HSG<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO STRIKE CERTAIN EXPERT TESTIMONY OF LANCE GUNDERSON AND PLAINTIFF'S MOTION IN LIMINE NO. 4**<br><br>Re: Dkt. Nos. 116, 162, 208 |

Pending before the Court are Plaintiff TVIIM, LLC's motion to strike certain expert testimony of Lance Gunderson and motion in limine No. 4 regarding evidence and argument that the joint venture agreement is a measure of damages. Dkt. Nos. 116, 162, 208. For the reasons stated below, the Court DENIES both motions.

**I.   BACKGROUND**

The following facts are drawn from the parties' briefing and are not in dispute unless otherwise indicated.

On June 15, 1999, U.S. Patent Application No. 09/333,547 ("the '547 Application") was filed on behalf of five named inventors. The '547 Application claimed the functionality of a security software program called HostCHECK. On August 20, 1999, the inventors assigned their interests in the '547 Application to their employer, DMW World Wide, Inc. ("DMW"). DMW did not commercialize HostCHECK.

The former owner of DMW, Frank Ricotta, Jr., sold the company in December of 2000 and founded a new security consulting firm called Innerwall, Inc. ("Innerwall"). Innerwall purchased HostCHECK and the pending '547 Application from DMW for $100,000 in cash and a $25,000 credit for unspecified costs ("Innerwall Transaction"). Innerwall also never commercialized HostCHECK.

In May of 2005, United States Patent No. 6,889,168 ("the '168 Patent") issued to Innerwall. The application that ultimately issued as the '168 Patent shares the same title and claims as the '547 Application.

In 2007, one of Innerwall's customers, Enterprise Information Management, Inc. ("EIM"), acquired certain interests of Innerwall, including the '168 Patent, in exchange for a 20% equity interest in EIM. EIM did not commercialize the '168 Patent. By the end of 2012, EIM was no longer generating revenues, in part due to the cancellation of a $50 million government contract in June 2012.

In January 2013, EIM entered into a joint venture with ThinkVillage Investments, LLC ("ThinkVillage"). Pursuant to the joint venture agreements, EIM contributed a portfolio of three patents and three patent applications—including the '168 Patent—and ThinkVillage agreed to fund, up to $1,000,000, the costs associated with the enforcement of the patent portfolio. EIM would have the right to recover any enforcement proceeds in excess of ThinkVillage's investment, up to the amount of that investment, and then 50% of any proceeds in excess of two times ThinkVillage's investment. The joint venture's operating agreement provides that the "fair market value" of the intellectual property contributed by EIM was $10,000. *See* Dkt. No. 131-21 at VOCK000860, 893-95. Plaintiff TVIIM is the entity created by the joint venture agreements.

In late 2010, Defendant began developing a vulnerability scanner feature to add to its consumer computer security software products. In its motion to exclude, Plaintiff asserts that Defendant "had completed the coding of the intended features for the initial release" of the vulnerability scanner in April 2012 and "released for testing a beta version of [its software] that included the vulnerability scanner" in June 2012. Dkt. No. 116 ("Mot.") at 4. Defendant disputes Plaintiff's characterization of these facts. *See* Dkt. No. 131 ("Opp.") at 12-13. It is undisputed that Defendant began selling the version of its computer security software that includes the vulnerability scanner feature in October 2012.

Defendant retained Lance Gunderson as an expert in this litigation to opine on damages. In his affirmative opinion, Mr. Gunderson opines that "damages that would adequately compensate [Plaintiff] for [Defendant's] alleged infringement of the '168 patent is a fully paid up,

2

lump-sum reasonable royalty between $10,000 (the price of a portfolio including the '168 patent in January 2013) and $100,000." Dkt. No. 207-1 ("Gunderson Report") at 5.

## II. DISCUSSION

### A. Legal Standard

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), requires that expert testimony offered at trial "both rests on a reliable foundation and is relevant to the task at hand." Federal Rule of Evidence 702, amended in response to *Daubert*, allows an expert witness to offer opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The test is "not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (internal quotation marks and citations omitted). "Under *Daubert*, the district judge is a gatekeeper, not a fact finder. When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 565.

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. A "reasonable royalty" usually derives from a hypothetical negotiation between the patentee and the infringer when the infringement began. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010). The hypothetical negotiation is a construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Often, in determining the reasonable royalty, experts consider one or more of a non-exhaustive list of fifteen factors set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

### B. Mr. Gunderson's Expert Opinion Is Admissible Because It Is Based Upon Sufficient Facts Or Data And Is The Product Of Reliable Principles And Methods

As noted above, Defendant's damages expert Lance Gunderson opines that, based on the

*Georgia-Pacific* factors, "damages that would adequately compensate [Plaintiff] for [Defendant's] alleged infringement of the '168 patent is a fully paid-up, lump-sum reasonable royalty between $10,000 (the price of a portfolio including the '168 patent in January 2013) and $100,000." Gunderson Report at 5. Plaintiff does not appear to challenge the principles and methods used by Mr. Gunderson to arrive at his conclusion, but Plaintiff makes five arguments in support of its position that Mr. Gunderson's affirmative damages opinion is based on insufficient facts or data.

First, Plaintiff argues that Mr. Gunderson relies on the wrong date for the hypothetical negotiation because he uses the date of the first sale of the accused product instead of an earlier date of first infringement. Plaintiff asserts that this mistake infects Mr. Gunderson's entire analysis because the later date is during a period in which the patentee was suffering severe financial distress; therefore, the patentee would be willing to accept a far lower price to license the patent.

The Court finds that Plaintiff's argument is a factual question that should be reserved for the jury, not a *Daubert* issue. Plaintiff's contention that the alleged infringement first occurred before October 2012 is based on disputed facts regarding the meaning of "feature complete" and the extent of beta testing in the summer of 2012. *See* Opp. at 13 ("There is no evidence in the record that during the development of the accused feature, a version was made or used ***in the United States*** prior to October 2012.") (emphasis in original). In fact, Plaintiff's own infringement expert opined that infringement of the '168 Patent did not occur until the fourth quarter of 2012—and it appears as though Plaintiff has not asserted that Defendant first infringed the '168 Patent in the spring or summer of 2012 prior to this motion. In any case, the Court finds that there are sufficient facts cited by Mr. Gunderson to support a date of first infringement in October 2012, and his opinion is therefore not "wishful thinking." *See Oracle Am., Inc. v. Google, Inc.*, 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011) (recognizing that "the date the product is first offered for sale in the United States may in fact be the date infringement began" but finding that Defendant's damages expert incorrectly relied on the date of first sale as the date of first infringement because Defendant failed to point to sufficient facts to support that date). Whether there are more persuasive facts to support an earlier date of first infringement is for the jury to

1  decide. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When, as
2  here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to
3  evaluate the correctness of facts underlying one expert's testimony.").

4  Second, Plaintiff argues that Mr. Gunderson's deposition testimony that, "from [his]
5  perspective," he did not believe that there would "be factual support from which the jury could
6  award more than $10,000," Dkt. No. 207-11 ("Gunderson Depo.") at 267:13-17, casts doubt on his
7  overall damages opinion, which sets the lump sum reasonable royalty somewhere between
8  $10,000 and $100,000. The Court disagrees. Plaintiff cherry-picks statements made at Mr.
9  Gunderson's deposition in an attempt to discredit his entire methodology, but those statements in
10 isolation do not reflect Mr. Gunderson's overall opinion that a jury *could* award damages up to the
11 $100,000 ceiling amount based on comparable historical transactions. *See* Gunderson Report at
12 12; Gunderson Depo. at 52:5-53:11. The Court finds that Mr. Gunderson pointed to sufficient
13 facts to support the $100,000 damages ceiling. Plaintiff plainly misstates Mr. Gunderson's
14 opinions and testimony when it asserts that he "conceded that the opinion had no factual support."
15 Dkt. No. 135 ("Reply") at 5.

16 Third, Plaintiff argues that because Mr. Gunderson never used the specific words
17 "economically comparable transaction" to describe the Innerwall Transaction, he cannot rely on
18 that transaction as a "data point" to arrive at his conclusion. But Plaintiff cites to no authority
19 requiring experts to use the magic words "economically comparable transaction" in order to save
20 themselves from *Daubert* exclusion, and the Court is not aware of any such authority. The cases
21 cited by Plaintiff analyzed situations where an expert attempted to rely on a transaction that he had
22 affirmatively opined was *not* comparable to the hypothetical negotiation. *See TV Interactive Data*
23 *Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1016 n.4 (N.D. Cal. 2013); *Open Text S.A. v. Box,*
24 *Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *5 (N.D. Cal. Jan. 23, 2015) ("Ordinarily, the
25 Court would not exclude reliance on those licenses unless the licenses shed no light on the
26 hypothetical negotiation, . . . [b]ut here, both [the plaintiff and the plaintiff's expert] agree that she
27 affirmatively rejected the licenses as non-comparable."). Mr. Gunderson never stated that the
28 Innerwall Transaction was not economically or technologically comparable, and Plaintiff does not

5

assert any specific reasons why the Innerwall Transaction would not be comparable. Read as a whole, Mr. Gunderson's report and deposition testimony make clear that there is "a basis in fact to associate the [Innerwall Transaction] to the hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011); *see, e.g.*, Gunderson Report at 12, 17 (stating that "the ownership transfers . . . of a patent may be indicative of the reasonable royalty or payment that would have been agreed to by the parties for a license to the patent at issue," noting that the Innerwall Transaction involved an ownership transfer of "the patent application for the '168 patent," and concluding that this "valuation[] of the patent (or underlying technology) during [an] earlier transaction[ is] consistent with a very low valuation of the patent"). The Court finds that the Innerwall Transaction involved the acquisition of all rights to the patent at issue here and therefore sheds light on the hypothetical negotiation. Any dispute about the "degree of comparability" of the two transactions should be left to the jury to decide. *See ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the [license agreements at issue] . . . are factual issues best addressed by cross examination and not by exclusion.").

Fourth, Plaintiff argues that Mr. Gunderson improperly relies on the joint venture agreements between EIM and ThinkVillage because the joint venture is not an economically comparable transaction to the hypothetical license negotiation. As alluded to above, the Federal Circuit requires that "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). However, the Federal Circuit has "never required identity of circumstances." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014). Instead, reasonable royalty calculations must "account for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). Furthermore, "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). The Court finds that the joint venture agreements are sufficiently comparable and relevant to the hypothetical license negotiation that they should be

6

presented to a jury.[1]  Mr. Gunderson testified that he believed the joint venture agreements were "comparable and relevant," Gunderson Depo. at 84:24-85:6, and he articulated three reasons why he believes any general economic differences between a joint venture and a hypothetical negotiation of a patent license do not affect the comparability of these specific transactions, *see* Opp. at 19-21.  It will be up to the jury to weigh Mr. Gunderson's opinion against that of Plaintiff's expert to determine the proper amount of damages to award, if infringement of a valid patent is found.

Fifth, Plaintiff argues that Mr. Gunderson's interpretation of the joint venture as a lump-sum license is simply wrong.  *See* Mot. at 18.  This argument challenges the correctness of Mr. Gunderson's opinion, in that it attacks his interpretation of the joint venture agreements.  A *Daubert* motion is not the proper means to attack the correctness of an expert's opinion.  Plaintiff will have ample opportunity to do so at trial.

When assessing a *Daubert* motion, the Court functions as a gatekeeper.  Its only role is to confirm the reliability and relevance of an expert witness's opinion.  The Court may not assess the "correctness" of that expert's conclusion at this stage.  Here, Plaintiff's arguments attack the ultimate conclusions reached by Mr. Gunderson and do not raise concerns about the methodology used to arrive at those conclusions.  As such, Plaintiff's arguments go to the weight of the evidence, and it is the province of the jury to compare and weigh the evidence.  Accordingly, Plaintiff's motion to strike certain expert testimony of Lance Gunderson is denied.  Because the above analysis applies equally to Plaintiff's motion in limine No. 4 to exclude evidence and argument that the joint venture agreements are a measure of damages, the Court also denies that motion.

---

[1] The Court is not persuaded that *DataQuill Ltd. v. High-Tech Computer Corp.*, 887 F. Supp. 2d 999 (S.D. Cal. 2011), a case cited by Plaintiff, addressed a similar situation to that presented here. The *DataQuill* court excluded expert testimony regarding the calculation of a reasonable royalty for a license to a single patent where the asserted comparable transaction involved a "worldwide license" with "heavyweights in the telecommunications industry" for a portfolio of "hundreds of patents covering a broad range of inventions." *Id.* at 1023.  Here, the joint venture agreements evidence the "fair market value" of three patents and three patent applications.  The Court finds that this transaction, although not identical to the hypothetical license, is sufficiently comparable to be presented to a jury.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion to strike certain expert testimony of Lance Gunderson and Plaintiff's motion in limine No. 4.

**IT IS SO ORDERED.**

Dated: July 9, 2015

*Haywood S. Gilliam Jr.*
HAYWOOD S. GILLIAM, JR.
United States District Judge